UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Rudell L. Clark Mullings,

                              Petitioner,

              – against –

United States of America

                              Respondent.

_____

<u>**NOT FOR PUBLICATION**</u>

<u>**MEMORANDUM & ORDER**</u>

15-cr-00538 (ERK)
19-cv-00817 (ERK)

KORMAN, *J.*:

## BACKGROUND

Petitioner Rudell Clark Mullings was a correctional officer in the Metropolitan Correctional Center ("MCC") when he became acquainted with Jane Doe, an inmate. PSR ¶¶ 3–5, ECF No. 12. Mullings engaged Doe in conversation, asking her personal questions and sharing information about his own broken-down marriage. *Id.* ¶¶ 5, 18. Mullings spoke to Doe whenever he was working in her unit. *Id.* ¶ 5. He made comments about wanting to see Doe when she was released from prison and that "he could not wait to put his little penis inside of her[.]" *Id.* ¶ 6. He also gave her special treatment, delivering food and cosmetic products to her both himself and through another correctional officer. *Id.* ¶ 7; *but see id.* ¶ 21 (Mullings's coworker contesting this characterization).

On February 14, 2015, Doe was waxing the floor between the suicide watch area and the medical area. *Id.* ¶ 8. Mullings, the correctional officer supervising her work, was the only other individual there. *Id.* He attempted to kiss and touch Doe, but she pushed him away. *Id.* When she bent over to pick something up off the floor, Mullings grabbed her, pulled down her pants, restricted her movement, and penetrated her with his penis. *Id.* ¶¶ 8, 14. Despite being eight inches shorter and nearly 200 pounds lighter, Doe pushed Mullings into a wall, and they both toppled to

1

the floor. *Id.* ¶¶ 3, 4, 8. Upset, Doe demanded an explanation from Mullings. *Id.* ¶ 8. He apologized, beseeched her not to tell anyone what happened, and informed her that there were no cameras in the area to corroborate her version of events should she report him. *Id.*

Later that same day, Doe called a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to report the assault and told him that she found semen on her underwear. *Id.* ¶¶ 9–10. DNA analysis later confirmed that the semen belonged to Mullings. *Id.* ¶ 9. The following day, Doe called her son and told him that "something really bad with an officer" had happened, but that she was afraid to report it because other officers might harass her or send her to the Special Housing Unit ("SHU"). *Id.* ¶ 11. On February 17, two days after she spoke to her son and three days after the rape, Doe told the ATF agent that she wanted to "just forget about it." *Id.* ¶ 12. The agent informed Doe that she had already set up a meeting with an Assistant United States Attorney ("AUSA"). *Id.* By the end of the month, Doe had recounted the assault to agents with the Office of the Inspector General, an MCC pastor and doctor, an AUSA, and a fellow inmate. *Id.* ¶ 13. Doe did so despite her fear.

Accompanied by counsel, Mullings waived his *Miranda* rights and spoke with an AUSA on July 21, 2015. *Id.* ¶ 15. Mullings's version of events changed several times throughout the interview after breaks during which he consulted with his attorney. For instance, Mullings initially denied both smuggling food and cosmetic products to Doe and his attraction to her, but later admitted both. *Id.* ¶¶ 18–19. More significantly, he began by describing Doe as a provocateur who grabbed his crotch, pulled down both of their pants, and backed into him to "set him up by having sex with him," *id.* ¶¶ 17–18, before clarifying that he pulled his own pants down and describing the encounter as consensual, *see id.* ¶ 19. Mullings admitted that he did not believe there were any cameras monitoring the area where the incident took place and made sure of this after-the-fact. *Id.*

¶¶ 17, 20. According to Mullings, the AUSA believed that Mullings had restrained and forcibly raped Doe but did not make that clear to Mullings. Mem. Supp. Pet., ECF No. 31, at 7–8.[1]

Mullings was arrested and pled guilty to sexual abuse of a ward in violation of 18 U.S.C. § 2243(b). PSR ¶ 23; Plea Hr'g Tr., ECF No. 6. Based on his plea, the PSR initially deemed a sentencing reduction for acceptance of responsibility appropriate, PSR ¶ 26, calculated a total offense level of 13 (which included a two-point increase for physically restraining the victim), and a Sentencing Guidelines range of 12 to 18 months. *Id.* ¶¶ 33, 79. During the sentencing hearing, I rejected both Mullings's attempt to eliminate the two-point increase for physical restraint and the U.S. Attorney's efforts to secure a two-point increase for obstruction of justice, and ultimately adopted the total offense calculation recommended in the PSR. Sent. Hr'g II, ECF No. 27, 2–8.

Prior to sentencing, the probation officer submitted Doe's victim impact statement, in which she described the incident as a rape and the intense emotional pain it caused. First Add. PSR, ECF No. 14. The AUSA found the victim's statements credible and advised me that he was prepared for a *Fatico* hearing where the victim would testify to counter Mullings's assertions that the sexual encounter was consensual. Second Add. PSR, ECF No. 15.

Mullings initially appeared for sentencing on April 27, 2016. At that hearing, I accepted the plea of guilty and began to discuss certain issues related to the Sentencing Guidelines with Mullings and his attorney, Damian Brown. *See* Sent. Hr'g I, ECF No. 28, at 2–5. In the midst of those discussions, I asked Federal Public Defender Michael Schneider, who happened to be present in the courtroom, to advise Mullings and his attorney on the strategic decision of whether to pursue

---

[1]    Mullings's petition and "Memorandum of Facts and Law" are both filed under ECF No. 31. Page numbers cited refer to the pagination on the documents, not the full PDF version of ECF No. 31.

a *Fatico* hearing. *Id.* at 5; *see* Schneider Decl., ECF No. 31, Ex. C, ¶ 3. I have occasionally done so when it appeared to me that defense counsel was not an experienced federal practitioner.

After a brief recess during which Brown discussed the matter with both Schneider and "some other colleagues," he requested "a short adjournment to further discuss [the *Fatico* hearing] with [his] client." Sent. Hr'g I at 6. The following week, Mullings's attorney informed me by letter that he would no longer "challenge the facts as submitted by the Government in its Presentence Report." May 2, 2016 Ltr., ECF No. 21. He reiterated this position at the final sentencing hearing two days later. *See* Sent. Hr'g II at 8.  Mullings was sentenced to an above-Guidelines sentence of 84 months' incarceration, because "the [G]uidelines for this particular offense . . . [didn't] reflect the . . . seriousness of the offense." *Id.* at 27–29.  The Second Circuit affirmed. *United States v. Mullings*, 713 F. App'x 46 (2d Cir. 2017).

Mullings is currently incarcerated and filed this timely motion under 28 U.S.C. § 2255 on the following grounds: first, that Mullings's first attorney failed to inform him of the plea agreement offered by the AUSA; second, that Mullings's first attorney failed to investigate allegations prior to Mullings entering a plea of guilty; third, that Mullings's second attorney failed to disclose the presentence report to him and investigate allegations prior to sentencing; fourth, that his second attorney and the federal public defender assigned to render advice failed to investigate Doe's allegations of forcible rape and its effect on sentencing before advising Mullings to forego a *Fatico* hearing; fifth, that the guilty plea was entered unknowingly and involuntarily due to a misrepresentation of the AUSA's position; and sixth, that the AUSA failed to provide exculpatory evidence prior to Mullings's guilty plea and sentencing in violation of due process. Pet. 4–14, ECF No. 31; Mem. Supp. Pet. 6–15.

**DISCUSSION**

"A prisoner in custody . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255. Relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

## I.   Ineffective Assistance of Counsel

### A.   The Standard for Ineffective Assistance of Counsel

Mullings's ineffective assistance claim is governed by the familiar two-part test laid out in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on his claim, Mullings must first establish that "counsel's performance was deficient," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. Generally, tactical or strategic decisions made by counsel cannot serve as the basis for a deficient performance claim. *See Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005); *see also Strickland*, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Second, he must demonstrate "that the deficient performance prejudiced the defense" by showing that there is "a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. To prevail on an ineffective assistance claim, Mullings must make a sufficient showing on both prongs. *Id.* at 697. Conversely, a failure to prove either element is fatal to his claim. *Id.* Thus, I "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* In sum, Mullings

must "affirmatively prove prejudice" by showing that the purported errors "actually had an adverse effect on the defense." *Id.* at 693. Speculative, conclusory, or self-serving allegations are insufficient. *See LeMarco v. United States*, 336 F. Supp. 3d 152, 169 (E.D.N.Y. 2018); *Pena v. United States*, 192 F. Supp. 3d 483, 491 (S.D.N.Y. 2016) (citing *Rosario v. Bennett*, 2002 WL 31852827, at *33 (S.D.N.Y. Dec. 20, 2002) (collecting cases)).

   B.  *Alleged Failure to Inform Mullings of the Plea Offer*

   The Supreme Court has "long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010). Because "plea bargains have become so central to the administration of the criminal justice system . . . [,] defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires." *Missouri v. Frye*, 566 U.S. 134, 143 (2012). Specifically, defense counsel is constitutionally required to relay all formal plea offers that may be favorable to the defendant. *Id.* at 145.

   Substantial evidence contradicts Mullings's claim that his first attorney, Anthony Ricco, never communicated the AUSA's plea offer to him and that he first learned of its existence during the change of plea colloquy. *See* Mem. Supp. 6. In an email from Ricco to the AUSA on November 2, 2015, Ricco explained his position that while Mullings was prepared to plead guilty to sexual abuse of a ward, he would not agree to a two-level advisory enhancement on the ground that the victim was physical restrained because that was "[n]ot applicable here." Ricco Email, ECF No. 37-2, at 1. Moreover, Ricco ended his message by stating: "Finally, for Missouri v. Fyre purposes[,] the proposed agreement has, in fact, been discussed with Mr. Clark Mullings." *Id.* Mullings insinuates that the email was doctored, calling it an "alleged email correspondence," Reply Br., ECF No. 39 ("Reply"), at 3. However, he offers no support for this claim. Indeed, Ricco

6

corroborated his email correspondence with the AUSA in a declaration that states: "Contrary to [Mullings's] present claim, the long-awaited plea agreement was discussed with . . . Mullings and was rejected." Ricco Decl., ECF No. 37-1, at 5. I find credible the evidence that Mullings's attorney informed him of the plea offer and its inclusion of a physical force enhancement, and therefore reject this claim.

Even assuming there was a factual basis for Mullings's claim, he does not explain how he was prejudiced by Ricco's alleged failure to inform him of the plea offer. The offer would have resulted in an offense level of 13, which is precisely the level recommended in the PSR. Indeed, Mullings does not claim that he would not have pled guilty had he been aware of the plea offer. *See Frye*, 566 U.S. at 148 (explaining that "where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial, the defendant will have to show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty") (internal quotation omitted).

### C.  Alleged Failure to Investigate

Mullings faults Ricco for not contacting the two female inmates assigned to wax the floor with Doe but who left the area before the incident occurred. Reply 4. While "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S. at 691, counsel need not "investigate comprehensively every lead or possible defense," *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005). Two individuals who were not present during the incident could not "have provided information verifying Mullings's claim that the sexual encounter was consensual." Reply 4. Thus, Mullings has "failed to establish that counsel's performance was deficient" because his "bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably." *Boyd v. Hawk*, 965 F. Supp. 443, 451–

52 (S.D.N.Y. 1997) (quoting *Matura v. United States*, 875 F. Supp. 235, 237 (S.D.N.Y. 1995)). Nor does Mullings explain how these or any other purported investigatory failures prejudiced him.

### D. Alleged Failure to Disclose the Presentence Report and Investigate Allegations

Mullings's next claim is that his second attorney, Damian Brown, failed to investigate allegations into physical restraint and to disclose the presentence report to him prior to sentencing, including that the government sought an enhancement for use of force, resulting in a more severe sentence.

The failure to investigate prong of this claim fails for the same reason discussed above. Nor does Mullings explain how the purported non-disclosure of the presentence report prejudiced him. Indeed, Mullings does not specify how he was injured by not seeing the presentence report at all. Assuming he would point to this as another reason why he was unaware of Doe's allegations—and the AUSA's belief—that he used physical force against Doe, there is ample evidence to the contrary. *See* Ricco Email; Ricco Decl.

Finally, the claim is refuted by the record. Mullings was interviewed extensively by a probation officer in anticipation of drafting the presentence report. PSR ¶ 47. Moreover, Mullings's sentencing memorandum and supplemental sentencing memorandum cite to the presentence report several times. *See* ECF No. 16, 16-1. Magistrate Judge Pollak also informed Mullings that a presentence report was being prepared and would be provided to me:

> JUDGE POLLAK: The important thing that you must understand is that until the time of sentencing when Judge Korman is going to get what is called a presentence report which will be prepared by the [P]robation [D]epartment following your plea here and the judge has an opportunity to hear from you, and to hear from Mr. Ric[c]o and to hear from the government's attorney, until that time, no one can promise you exactly what your sentence will be; not . . . Mr. Ricco, not the government's attorney, not me, not even Judge Korman until then. Do you understand that?
>
> THE DEFENDANT: Yes, ma'am.

Plea Hr'g Tr. 18. Indeed, before asking Mullings how he pled, Magistrate Judge Pollak asked him if he had "any questions that [he] would like to ask [her] about the charge or [his] rights or the plea agreement or anything else before . . . proceed[ing]?" *Id.* at 24. Mullings replied, "No, ma'am." *Id.* Moreover, Brown's affidavit, which I requested in order to supplement the record and which I credit, disputes Mullings's claim and explains that "[t]he defendant and I not only were both present for his interview by Probation in order for Probation to issue the PSR, but the defendant and I used the PSR in order to review for corrections and also to assist in our preparation of a Sentencing Memorandum." Brown Decl. at 4, ECF No. 45.

In sum, ample evidence indicates that Mullings was made aware of the presentence reports existence and its contents. He provides no evidence to the contrary in support of his claim that he was not provided with it prior to sentencing. *Cf. Carty v. Artuz*, 2003 WL 22964577, at *6 (E.D.N.Y. Nov. 11, 2003) (denying petition because of lack of proof that counsel failed to read and consider the presentence report).

I add these words to explain why I did not follow my invariable practice of asking a defendant whether he has read the presentence report. The date on which I imposed sentence—May 4, 2016—was the second date on which Mullings appeared for sentencing. He had previously appeared for sentencing on April 27, the date that I accepted the plea and asked Schneider to offer his advice on the merits of a *Fatico* hearing. After a colloquy regarding the appropriate calculation of the Guidelines sentence and the need for a *Fatico* hearing, Mullings's attorney, Brown, requested "a short adjournment to further discuss [the *Fatico* hearing] with [his] client," in light of his "discussion with Mr. Schneider and . . . with some other colleagues." Sent. Hr'g I at 6. Brown specifically said that he thought "it would be in [Mullings's] best interest to revisit the idea [of a *Fatico* hearing]." *Id.* I granted his request. When Mullings appeared at the second sentencing hearing a week later, I asked my courtroom deputy whether I had already "go[ne] through the

preliminaries" and asked Mullings if he had "read the presentence report." Sent. Hr'g II at 8. My deputy responded that I had already inquired about that "at the last appearance." *Id.* This was one of the only times that I can remember that her memory was inaccurate. Nevertheless, no one contradicted her and the presentence report was discussed at length during this hearing in the presence of Mullings. In any event, the Second Circuit has explained that although it is preferable for the district judge to ask a defendant directly if he has reviewed the presentence report, all that is required is that there be a "reasonable inference[] about whether the defendant has had an opportunity to review" it, such as based on counsel's objections to the presentence report before the court, which occurred here. *United States v. Cortez*, 841 F.2d 456, 460–61 (2d Cir. 1988).

### E.  *Advice to Forgo a* Fatico *Hearing*

Mullings's final ineffective assistance claim is that Brown and Federal Public Defender Michael Schneider, who happened to be present in the courtroom and whom I asked to consult with Mullings and Brown on the *Fatico* issue, failed to provide appropriate counsel before advising Mullings to forgo a *Fatico* hearing.

The same duty of effective assistance applies to the sentencing phase. *See Williams v. Taylor*, 529 U.S. 362, 395 (2000). However, the Second Circuit "will not normally fault counsel for foregoing [sic] a potentially fruitful course of conduct if that choice also entails a significant potential downside." *Greiner*, 417 F.3d at 319 (citations and internal quotations removed). Specifically, counsel may permissibly forgo a *Fatico* hearing as a "matter of strategy," and that strategy is presumed reasonable unless there is a strong showing to the contrary. *United States v. Santiago*, 330 F. App'x 234, 238–29 (2d Cir. 2009) (quoting *United States v. Lee,* 818 F.2d 1052, 1056 (2d Cir. 1987)). As I advised Mullings,

> [I]f you want a *Fatico* hearing, I don't think you have much to lose. . . . I am just concerned . . . there's always the strategic decisions . . . there's always a risk, number one, if he takes the stand then he could subject himself to a two-point enhancement for obstructing justice if I should find

10

> that he lied. And number two. . . it's one thing for a judge to read about something on a written document. When you have the *Fatico* hearing, particularly in a case like this, it becomes a much more . . . vivid presentation of what happened. . . . The issue of whether there was restraint here is an issue that . . . may be relevant to what sentence I give you.

Sent. Hr'g II at 5-6.

"An informed decision to pursue a litigation strategy, even if that strategy turns out badly for the defendant or seems unwise in retrospect, does not constitute ineffective assistance of counsel so long as it is a 'conscious, reasonably informed decision made by an attorney with an eye to benefitting his client.'" *Schwamborn v. United States*, 492 F. Supp. 2d 155, 163 (E.D.N.Y. 2007), *adhered to in relevant part on reconsideration*, 507 F. Supp. 2d 229 (E.D.N.Y. 2007) (quoting *Pavel v. Hollins,* 261 F.3d 210, 218 (2d Cir. 2001)). Indeed, in *Santiago*, the Second Circuit found it "wise" to forgo a hearing where previous violent conduct "would have been reviewed in detail for the benefit of the district court." *Santiago*, 330 F. App'x at 239. Similarly, here, it seems that it was in Mullings's "best interest[] to avoid giving the government an opportunity to elicit even more damaging testimony at a *Fatico* hearing," and thus was "objectively reasonable under the circumstances." *Schwamborn*, 492 F. Supp. 2d at 163. That I upwardly departed and imposed a harsher sentence than expected by Mullings, Brown, Schneider, and the other lawyers Brown consulted, or that there is some possibility that I would have found Mullings to have testified credibly in a *Fatico* hearing, is of no consequence.

Moreover, there was "no indication that a *Fatico* hearing would have resulted in favorable factual findings." *Santiago*, 330 F. App'x at 239. In a case like this, where there were no witnesses present, the resolution of the *Fatico* hearing would have depended solely on Mullings's and Doe's credibility. While the AUSA had two recorded phone calls where Doe reported the assault, *see* PSR ¶¶ 10–11, Mullings had no evidence to support his claim that the sexual encounter was consensual. Instead, Mullings repeatedly lied and changed his story throughout his interview with

the AUSA in July 2015. PSR ¶¶ 15–20. Given these considerations, I reject Mullings's ineffective assistance of counsel claim as it relates to the *Fatico* hearing.

## II. <u>Knowing and Voluntary Guilty Plea</u>

Mullings complains that "the [Magistrate], the [AUSA], and Attorney Ricco failed to inform Mullings that it was the [AUSA's] position that Mullings physically restrained and forcibly raped [Doe]." Mem. Supp. Pet. 7–8. This claim, which I have already discussed, fails for the more basic reason that during the plea allocution, the Magistrate advised Mullings that the sentence prescribed for the crime to which he was pleading was 0 to 15 years, and that the Sentencing Guidelines "are merely that; a guide to help the Court determine where within that [0 to 15] year range your sentence should fall." Plea Hr'g Tr. 17–18. More significantly, she asked the AUSA to "put on the record what his calculation of the Guideline range is based on what we know today." *Id.* at 19. The AUSA responded that "the offense level here is a 13 which carries a range of 12 to 18 months imprisonment." *Id.* While the AUSA did not go into detail as to how he calculated this range, the basic fact is that Mullings was willing to plead guilty knowing the sentence he likely faced under the advisory Guidelines. The fact that Mullings may not have been aware that the base offense level included two points for physical restraint obviously did not affect the knowing and voluntary nature of the plea. Indeed, after an extensive colloquy that fully complied with Federal Rule of Criminal Procedure 11, the Magistrate found that Mullings was "acting voluntarily, fully underst[ood] his rights and the consequences of his plea and that there [was] a factual basis for the plea" and "recommend[ed] to [me] that [I] accept [the] plea of guilty to the charge contained in the information." *Id.* at 26.

Moreover, before accepting the Magistrate's recommendation that I accept the plea, I asked both parties if there was "[a]ny reason why I should not accept the plea of guilty?" Sent. Hr'g I at 2. Neither Mullings nor his attorney objected. Only then did "I adopt the recommendation of the

[M]agistrate that the plea was knowingly and voluntarily entered with a full understanding of the rights and consequences of [the] plea." *Id.* In sum, even if, contrary to his attorney's affidavit, *see* Ricco Decl. 9–10, Mullings was unaware of the AUSA's position with respect to the use of physical force, that did not affect the knowing and voluntary nature of his plea.  *See United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997).

## III.     *Brady*

Mullings claims that the AUSA failed to provide *Brady* material prior to his entry of a plea of guilty and sentencing. Pet. 9 (citing *Brady v. Maryland*, 373 U.S. 83 (1963)). The facts underlying this claim are as follows: Three days after Mullings's May 4, 2016 sentencing, the counsel of a cooperating witness ("CW-1")—an inmate at the MCC—informed the AUSA that CW-1 had more information than she had previously revealed in an August 14, 2015 interview. May 18, 2016 Ltr. to Def. Counsel, ECF No. 31, Ex. D, at 1. After re-interviewing CW-1 on May 11, 2016, the AUSA wrote a letter dated May 18, 2016, to Mullings's counsel, summarizing what the May 11, 2016 interview revealed, as well as the contents of the initial interview on August 14, 2015 for context: "During the August 14 interview, CW-1 had stated in sum and substance and in part that (1) [Doe] did not mention anything to [CW-1] about a relationship with [Mullings]; (2) CW-1 did not notice [Mullings] paying special attention to [Doe]; and (3) CW-1 was not aware if [Doe] had received any contraband items from [Mullings]." *Id.* Yet in the May 2016 interview, CW-1 had additional, substantially different information. She told the AUSA that Mullings was bringing contraband to Doe, that another inmate told CW-1 that Doe and Mullings had sex but neither were eyewitnesses, and that her personal opinion was that the incident was not rape. *Id.* at 1–2. It was only after this second interview that the AUSA informed defense counsel of the contents of both meetings. Mullings argues that the AUSA's initial August 14, 2015 interview with CW-1 contained exculpatory information that should have been disclosed prior to sentencing.

No *Brady* obligations arose from the first interview conducted with CW-1 on August 14, 2015. The information revealed to the AUSA at that interview was not "evidence favorable to [the] accused." *Brady*, 373 U.S. at 87. CW-1 merely denied awareness of any relationship or special treatment between Mullings and Doe. *See* May 18, 2016 Ltr. to Def. Counsel. That is not exculpatory information, nor does it support Mullings's claim that no physical force was used.

As to the second interview, which occurred nine months after the first interview and after Mullings was sentenced, *Brady* simply does not apply. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009) (holding that prosecutor's *Brady* obligation does not extend to the postconviction context). Even if this second interview had been conducted prior to Mullings's guilty plea, it is not clear the information obtained would have fallen within *Brady*'s mandate. *See United States v. Ruiz*, 536 U.S. 622, 633 (2002) ("[T]he Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."). In any event, this information was promptly disclosed to defense counsel, foreclosing petitioner's argument that such information was suppressed. *See* May 18, 2016 Ltr. to Def. Counsel.

IV.     **Knowing and Voluntary Waiver of *Fatico* Hearing**

Although Mullings does not raise this claim, I construe his *pro se* petition liberally to allege that he did not knowingly and voluntarily waive his right to a *Fatico* hearing. This claim is related to, but conceptually distinct from, his claim that he received ineffective assistance of counsel in deciding to waive his right to a *Fatico* hearing. Pet. 9. Essentially, Mullings may have received flawed information on the merits and consequences of a *Fatico* hearing. Thus, he might argue that his waiver of the *Fatico* hearing was not "knowing and intelligent." *See United States v. Morgan*, 51 F.3d 1105, 1110 (2d Cir. 1995) ("A waiver of a constitutional right must be voluntary, knowing

14

and intelligent, that is, the act of waiver must be shown to have been done with awareness of its consequences.").

Specifically, Schneider believes he may have informed Mullings that I "most often impose[] sentences within the guideline range." Schneider Decl. ¶ 6. The more relevant advice, however, would have related to the likelihood of an upward departure based on the nature of the crime Mullings committed.

Nevertheless, I made clear at the second sentencing hearing that I thought the dispute over the guidelines was not relevant because "I [thought] that this [was] a case that warrants an upward departure." Sent. Hr'g II at 4. Later during the same hearing, I told Mullings that, "when you have a *Fatico* hearing, . . . particularly in a case like this, it becomes a much more . . . vivid presentation of what happened," and I implied that this would be worse for him than having me simply "read about something on a written document." *Id.* at 6. When I told Mullings this, however, I might not have realized at the time that the victim would expand upon her written statement in court, making the kind of vivid presentation I had warned Mullings about.

Still, I am convinced that, based on the supplemented record, the statements I made did not undermine the knowing and voluntary nature of Mullings's decision not to request a *Fatico* hearing. Most importantly, Mullings's attorney advised me two days *before* the second hearing that he did not seek a *Fatico* hearing and would "not challenge the facts as submitted by the Government in its Presentence Report," including that Mullings used force in his sexual encounter with the victim. ECF No. 21. Brown confirmed in Mullings's presence at the second sentencing hearing, after I gave him time to discuss with Mullings during the hearing, that "I have spoken with my client again and our position remains the same, that we are not objecting and we do not want to have the *Fatico*. We ask to go to sentencing." Sent. Hr'g II at 8. Immediately after Brown so advised, I noted that "the victim is here and she has a right to make a victim impact statement."

*Id.* Indeed, the victim spoke before Mullings, and thus Mullings could have contested her description of the physical force he used if he cared to. *Id.* at 14–16. He chose not to do so. *Id.* at 22–23.

Moreover, the Second Circuit has held that it is not forbidden, and is indeed "sensible," for "a sentencing court to offer a realistic assessment of the possible, or even probable, negative consequences of pursuing a presentence hearing with respect to a factual issue, provided there has been no predetermination that those consequences will result regardless of the outcome of the requested hearing." *United States v. Desimone*, 119 F.3d 217, 230 (2d Cir. 1997). I repeatedly told Mullings that I was willing to hold a *Fatico* hearing should he request one, and had he done so I would have listened with an open mind. *See* Sent. Hr'g I at 4; Sent. Hr'g II at 5–8. I emphasized that it was a "strategic decision" for Mullings to make and noted that I didn't "think [Mullings] [had] much to lose." Sent. Hr'g II at 5. I merely noted the risks to Mullings of holding the hearing that I described above, that it was up to Mullings to weigh those risks, and that I was "happy to do it" if Mullings changed his mind and sought the hearing. *See id.* at 5–6. After consulting further with Brown, Mullings reiterated that he did not want a *Fatico* hearing. *Id.* at 8.

Ultimately, Mullings was aware that he faced an upward departure. Indeed, I told him that before explaining the possible negative consequences of a *Fatico* hearing. *Id.* at 4. Moreover, while Brown's advice may have not been entirely helpful given the circumstances, "defense counsel's mistaken estimate of a judge's likely sentence" does not vitiate the knowing and intelligent nature of a waiver. *Johnson v. Fisher*, 2006 WL 1912737, at *5 (E.D.N.Y. July 11, 2006); *see also Seiller v. United States*, 544 F.2d 554, 568 (2d Cir. 1975) ("A mistaken estimate by defense counsel of the sentence Seiller could expect to receive would not vitiate his pleas of guilty."). Indeed, Brown's declaration, which I requested in response to Mullings's petition, made precisely this point, characterizing the decision to forgo a *Fatico* hearing as "a strategic decision that despite my

16

disappointment with the ultimate sentence, I would not change if I were to do it over again under the same circumstances. Quite often there are decisions that attorneys make that have no guarantees."   Brown Decl. at 5–6.

Accordingly, even construing Mullings' petition liberally to contain an argument that he does not make, he has failed to demonstrate that his decision to forgo a *Fatico* hearing was not knowing and voluntary.

## V. <u>Discovery and Hearing Request</u>

Mullings's February 4, 2019 discovery request, *see* ECF No. 32, is denied. The U.S. Attorney has fulfilled his disclosure obligations, and no further witness interviews will be ordered. As for Mullings's request for a hearing, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). Nevertheless, where "the record [is] supplemented by a detailed affidavit from trial counsel credibly describing the circumstances concerning" the petitioner's claim for relief, dismissal of the petition without a live hearing may be warranted. *Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001). Nor is a testimonial hearing necessary where the evidence submitted by a petitioner is "self-serving and improbable." *Id.* at 86; *see also Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009) ("[W]hen the judge that tried the underlying proceedings also presides over the Section 2255 motion, a less-than full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner.").

Here, "the record was supplemented by a detailed affidavit from trial counsel credibly describing the circumstances" surrounding counsel's purported failings. *Chang*, 250 F.3d at 85. As explained above, the declaration and email provided by Ricco—one of the finest defense attorneys

17

who has ever appeared before me—persuasively and comprehensively rebuts Mullings's claims that he failed to convey a plea offer and failed to investigate. I also ordered Brown to file an affidavit addressing Mullings's claims, in which Brown persuasively explains that he discussed the presentence report with Mullings and discussed the strategic decision of whether to pursue a *Fatico* hearing. *See* ECF No. 45. Finally, Mullings submitted a declaration (in his pro se § 2255 petition) from Schneider providing his perspective on the proceedings. *See* ECF No. 31, Ex. C.  In light of this augmented record and Mullings's lack of credibility due to his shifting stories about what happened in this case, I see no value to holding a hearing.  *Chang*, 250 F.3d at 86.

Mullings also claims that, as part of the advice to forgo a *Fatico* hearing, Schneider advised him that "this is what the Judge wants to do" and that I would "sentence Defendant to probation or six months if no Fatico was held and one-year and one day sentence if a Fatico was held."  Pet. at 9; Mem. Supp. Pet. at 10–11.  Schneider denies advising Mullings and his lawyer about any specific sentence range, explaining "I don't recall advising Mr. Mullings or his attorney what sentence Mr. Mullings could expect, but I may have said that my experience was that Judge Korman most often imposes a sentence within the guideline range." Schneider Decl. ¶ 6.

I decline to order a hearing based on this dispute.  In the end, it was Brown who made the final decision, in consultation with Mullings, to forgo a *Fatico* hearing—not Schneider.  Moreover, it is extremely unlikely that an experienced criminal defense attorney like Schneider would advise Mullings and his attorney to that degree of specificity about the likely sentence I would impose. Significantly, Mullings's story is premised on the assumption that in the absence of a hearing he would have received a below-Guideline sentence, but that with a hearing he would have received a sentence at the bottom of the Guideline range.  That simply makes no sense.  Mullings's decision to forgo a *Fatico* hearing would have left in place two points for the use of force that were included in the PSR, and it is inconceivable that I would have imposed a sentence of "probation or six

months" for what amounted to the offense of rape.  Schneider's alleged prediction that if Mullings *did* seek a *Fatico* hearing that I would impose a bottom-of-the-Guideline sentence of one year and one day likewise makes no sense, because it presupposes that my sentence would have been the same regardless of the outcome of the hearing even if I found that Mullings had used force.  Moreover, by the time he made his final decision to forgo a *Fatico* hearing, at the second sentencing hearing, I had already commented that an upward departure was likely warranted.  Sent. Hr'g II at 4.  I then gave Mullings and Brown an additional recess to make a final decision about whether to request a hearing, and by that time any misimpression about the sentence I was likely to impose should have been resolved.

In sum, the credibility of Mullings's account would not be bolstered by holding a hearing, particularly with respect to his conversation with Schneider.  As with Mullings's other claims arising out of his case after he dismissed Ricco, "the record [is] sufficient to support dismissal" without a hearing, particularly in light of the thorough colloquy before Magistrate Judge Pollak and the discussion of the relevant considerations I held in his presence. *Chang*, 250 F.3d at 85.  Conducting a full testimonial hearing would lead to "needless expenditure of judicial resources, . . . burden . . . trial counsel and the government, and perhaps . . . encourage[] other prisoners to make similar baseless claims" without "offer[ing] any reasonable chance of altering [my] view of the facts." *Id.* at 86.

## CONCLUSION

The petition for relief pursuant to 18 U.S.C. § 2255 is denied. I also decline to issue a certificate of appealability.

**SO ORDERED.**

*Edward R. Korman*

Edward R. Korman

United States District Judge

Brooklyn, New York

November 2, 2020